IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,  :

v.                                                    :   CRIMINAL CASE NUMBER:

MICHAEL B. WALLER                  :   1:15-CR-0083-WSD-JSA

REPORT AND RECOMMENDATION

Defendant Michael B. Waller is charged with being a felon in unlawful possession of a firearm, in violation of Title 18, U.S.C. §§ 922(g), 924(a)(2) and 924(e). Much of the evidence against him was obtained during an incident on September 17, 2014. Specifically, police officers stopped the car in which Defendant was a passenger and, during the stop, Defendant spontaneously bolted from the car and ran away. The officers quickly captured Defendant and, in doing so, allegedly found a firearm and other evidence.

Defendant concedes that the officers properly stopped the car. According to Defendant, however, the officers eventually crossed the line from engaging in a permissible investigatory stop to instead conducting a warrantless seizure that violated Defendant's Fourth Amendment rights. Defendant argues that his flight and any discovery of evidence should be suppressed.

The Court held an evidentiary hearing that began on July 29, 2015 and, at

the Defendant's request, was reopened and continued on August 25, 2015 [35] [37] [38] [39].  On the basis of this testimony and the parties' legal arguments, the Court finds that the officers engaged in a permissible investigatory stop and that there is no basis to suppress the evidence obtained during Defendant's capture and arrest.  It is therefore **RECOMMENDED** that Defendant's Motions to Suppress [9] [10] be **DENIED**.[1]

## I.   FACTS

On September 17, 2014, Officers Sajdak and Daniels with the Atlanta Police Department's ("APD's") Violent Crime Task Force were patrolling the area of the Rolling Bends Apartments in west Atlanta.  (Tr. at 3, 4, 64-66).  The officers considered this to be "a very high crime area," involving "[a] lot of subjects involved in robberies," and "[a] lot of stolen vehicles [that] are returned to that area." (*Id.* at 3-4).

At approximately 10:00 pm that evening, the officers pulled over a Dodge Charger that did not have a light illuminating the license plate as required by

---

[1] Document No. 9 is Defendant's Motion to Suppress the evidence resulting from the warrantless traffic stop.  For the reasons discussed herein, the Court recommends that this Motion be denied as meritless.  Document No. 10 is Defendant's Preliminary Motion to Supress Statements.  In the preliminary motion, Defendant indicated that he was not aware of any statements obtained from him, but he nevertheless filed the motion just in case there were.  This Motion was never perfected and no party introduced evidence of any statements obtained from Defendant.  Therefore , it is recommended that Document No. 10 be denied as moot.

Georgia law.  (*Id.* at 5, 66).  Officer Sajdak approached the front passenger window, and found a female driver, a female passenger in the front, and Defendant in the back seat behind the driver.  (*Id.* at 6-7, 67-68).  Officer Sajdak's standard procedure when conducting a traffic stop included requesting identifying information for the occupants, to see if they have any outstanding warrants.  (*Id.* at 9).  Defendant initially stated that he had identification documentation, but "then when [Officer Sajdak] asked if it's okay to see it, [Defendant] then said that he didn't have it on him."  (*Id.*)

Shortly thereafter, as Officer Sajdak was talking to the Defendant, the Defendant spontaneously opened the car door and tried to get out.  (*Id.* at 9-10).  At this point, Officer Daniels approached and instructed Defendant to stay in the car.  (*Id.*).  It was not normal for an occupant during a traffic stop attempt to leave the car.  (*Id.* at 68). The Defendant "began to show signs of nervousness," including beading sweat, heavy breathing, and throbbing arteries in the neck.  (*Id.* at 70).

This conduct "got my attention," according to Officer Sajdak.  (*Id.* at 10).  Officer Sajdak asked for Defendant's name and date of birth, and Defendant responded with a birth date and a name that later proved to be false, Jeremy Waller.  (*Id.* at 10-11).  Officer Sajdak then returned to his patrol car to run the identity information in his mobile computer system.  (*Id.* at 11-13).  The counter on the video file of the incident–taken from a camera affixed to a nearby apartment

complex–shows that Officer Sajdak did so approximately 2 minutes and thirty seconds into the traffic stop. (Gov't Ex. 1).

Officer Sajdak explained that, by the time he returned to his car, the Defendant "kind of became the focal point," having given inconsistent information about whether he possessed identification documents, having attempted to leave the car during the stop, "and having to be told several times to remain in the car . . . ." (Tr. at 13). The officers were concerned as to "why is this individual trying to leave. So we wanted to make sure who we're talking with so in case he had a warrant . . . ." (*Id.*). Officer Sajdak ran the identity information offered by the Defendant through the ACIC database, which includes information about Georgia driver's licenses but not other sources. (*Id.* at 40-41). The response from the database indicated that the "Jeremy Waller" identity offered by Defendant was "not on file." (*Id.* at 12). The database, however, indicated a "possible" warrant under a different name, that is, "Dwayne Thomas Waller." (*Id.* at 14).

While he began to run more checks, Officer Sajdak asked another officer who had arrived on the scene, Officer Ayala, to alert Officer Daniels about the possible warrant. (*Id.* at 16-17). Officer Daniels and Ayala at that point asked the Defendant to step out of the car, "and that's when Mr. Waller, I noticed him pushing the officer and running on foot." (*Id.*). Defendant ran a short distance away, where he was tackled by Officer Ayala. (*Id.* at 17-19, 75-76, 137-138).

Officer Daniels thereafter saw the Defendant pull a black handgun out of his pants pocket. (*Id.* at 76-77). After a scuffle, the officers found a handgun on the ground underneath where Defendant had been lying. (*Id.* at 20-21, 77-78, 141-142).

## II.   DISCUSSION

The Fourth Amendment protects individuals against government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *United States v. Place*, 462 U.S. 696, 706-07 (1983). A traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The police are authorized to detain traffic violators for a reasonable amount of time as part of such a seizure. *United States v. Hernandez*, 418 F.3d 1206, 1209 (11th Cir. 2005). Specifically, in the context of a traffic stop, "we hold that, ... the first Terry condition 'a lawful investigatory stop' is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

Defendant does not contest that the officers were justified in pulling the Dodge Charger over, in approaching the car, and even in inquiring as to the identification of the occupants, including Defendant. Defendant's argument, rather, is that as of when the Defendant "kind of became the focal point" of the traffic stop, the police had moved beyond the circumstances that justified the initial stop, that is, the license plate light violation. From that point forward, according to

Defendant, the detention became unreasonable. The officers continued to restrain Defendant without a warrant for the sole purpose of inquiring as to whether he might have furnished a false name, which no longer had anything to do with the driver's minor moving violation. Thus, Defendant argues that any evidence obtained during and as a result of his subsequent flight from the car must be suppressed.

Absent other indications of illegal activity, a traffic stop may last only as long as it is necessary to effectuate the purpose of the stop. As the Eleventh Circuit has said:

> [T]he *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop. *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999). The traffic stop may not last "any longer than necessary to process the traffic violation" unless there is articulable suspicion of other illegal activity. *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir.1997).

*United States v. Purcell*, 236 F.3d 1274,1277 (11th Cir. 2001).

However, the United States Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure. [E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (citations omitted).

*Muehler* effectively rejected any inquiry into whether an officer's questions were within the scope of the original traffic stop. Rather, so long as an officer's actions did not unreasonably prolong an otherwise valid traffic stop, the officer did not separately need additional reasonable suspicion to ask other unrelated questions and take unrelated investigative steps. *Id.* at 101.

*Muehler* also left in place the long standing precedent that allows police officers leeway in their investigation after making a lawful traffic stop. Following a lawful routine traffic stop an officer may question a driver about the traffic violation, seek consent to search, and conduct a variety of checks on the driver and his car. *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999). An officer may investigate and review rental papers. *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999). Numerous courts have also found that an officer may ask about the purpose and itinerary of a driver's trip. *See, e.g., United States v. Gonzalez*, 328 F.3d 755, 758-59 (5th Cir. 2003); *United States v. Givan*, 320 F.3d 452, 459 (3rd Cir. 2003) (noting that "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop"); *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) ("An officer does not violate the Fourth Amendment by asking the driver his destination and purpose, checking the license and registration, or requesting that the driver step over to the patrol car."); *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc) (noting that

questions relating to a motorist's travel plans are ordinarily related to the reason for the stop); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999) (an officer's questioning of the defendant "as to his moving plans at the outset of the stop was reasonable in that the questions related to [the defendant's] purpose for traveling").

Furthermore, "[t]he officer may also prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check." *Purcell*, 236 F.3d at 1278 (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Indeed, the justification to run routine computer checks to investigate identities extends to all of "a vehicle's occupants." *Id.* After all, "passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well." *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (citing *Maryland v. Wilson*, 519 U.S. 408, 413–14,(1997); *United States v. Jenson*, 462 F.3d 399, 403-404) (5th Cir. 2006); *see also United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir.1989) (officer permitted to ask questions about the identity of passengers during a traffic stop).

The Supreme Court most recently addressed this issue in *Rodriguez v. United States*, – U.S. –, 135 S.Ct. 1609, 1615 (2015). The Court reiterated that, unless reasonable suspicion of another crime arises, a traffic stop must last no longer than reasonably necessary to address the original "mission," that is, to

"address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (Internal citations and quotations omitted). As the Court put it, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Where the officers prolong a stop beyond this point, even for just a few minutes, the Fourth Amendment is violated. *Id.* at 1616.[2]

Nevertheless, the Court also reiterated that the "mission" of the stop includes ordinary computer and other identity checks. *Id.* at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.") (Internal citations and quotations omitted).

Applying these standards, Defendant's motion fails, because Officer Sajdak's inquiry never progressed beyond the reasonable duration and "mission" of an ordinary traffic stop. As noted at length above, the officers were not limited to simply stopping and writing the driver a ticket. Rather, the officers were also

---

[2] With this decision, the Court overruled precedents from some Circuits that had upheld a "*de minimus*" rule, that is, a rule that tolerated seizures that prolonged a traffic stop beyond the original mission, and without reasonable suspicion, but only by a small period of time. *Id.* at 1615-1616.

empowered to engage in at least brief, minimally-intrusive identity inquiries, including computer checks, as to the driver and all occupants. The record shows that the officers were in the midst of engaging in these basic tasks here when the Defendant pushed down an officer and fled. And only a few minutes had elapsed by that point. Because the officers had done nothing to unreasonably prolong the stop, and were only engaged in basic, proper checks as to the identities of the individuals, there was no Fourth Amendment violation.

Moreover, "'if the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention.'" *Simmons*, 172 F.3d at 779 (citing *United States v. Hardy*, 885 F.2d 753, 757 (11th Cir. 1988) (quoting *United States v. Cruz*, 581 F.2d 535, 539 (5th Cir. 1978)). Even before he fled, the Defendant gave conflicting accounts as to whether he had identification papers with him, actually attempted to leave the car on his own, and showed visible signs of nervousness. And not only did Defendant's "name" return no "hits," but the system suggested a possible outstanding warrant in another name.

Obviously, none of these facts were sufficient to charge Defendant with a crime. As Defendant points out in retrospect, he simply might not have had a Georgia driver's license. And the open warrant simply might have been in the name of another individual with the surname "Waller." But the combination of all of these facts was sufficient to at least permit the officers to briefly and with

minimal intrusion investigate who they were dealing with, and whether the warrant applied. And once an individual who had been flagged for a possible warrant actually pushed down an officer and fled, there is no question that the officers have reasonable suspicion to chase after him.

By contrast with the facts here, *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) illustrates where officers go too far. In that case, the officers stopped a car for driving 65 miles per hour in a 55 miles per hour zone. Instead of just writing up the ticket and engaging in minimally non-intrusive computer checks as to the identity of the occupants, the officers also inquired as to the driver's travel plans, what he did for a living, whether he was related to the other occupants, and whether he would consent to a search. But most notably, after the driver declined to consent to a search, and without any reasonable suspicion of a drug offense, the officers put the entire encounter on hold while they called for a drug-sniffing dog. Nearly one-half hour after the initial stop–and without any reasonable suspicion of any violation other than the initial 10 mph speeding infraction–the drug dog finally arrived, engaged in an open-air sniff, and alerted to the presence of drugs. The Eleventh Circuit found that the officers violated the Fourth Amendment by prolonging the stop for purposes of a canine narcotics search that had nothing to do with the initial moving violation.

*Pruitt* is similar to the facts of *Rodriguez*, in which officers also prolonged a

traffic stop initially based on a perceived moving violation so as to await the services of a drug-sniffing dog. The Supreme Court found that because the drug sniff was unrelated to the "mission" of the original traffic infraction, and is not "an ordinary incident of a traffic stop," the duration of the seizure in that case was unconstitutional. *See Rodriguez*, 135 S.Ct. at 1615-1616.

Many distinctions separate *Pruitt* and *Rodriguez* from this case. In both those cases, the dalliance with a drug dog had absolutely nothing to do with the originally speeding violation, clearly extended the duration of the stop beyond what legitimately related to that violation, and was not supported by any other reasonable suspicion at all. Here, all the officers did was engage in minimal inquiries, including basic computer checks, as to the identity of the occupants. They were entitled to spend a few minutes on these basic tasks as part of the initial stop. And the officers had also developed specific suspicion as to Defendant and whether he might have been the subject of a possible warrant.

Defendant makes much of Officer Sajdak's statement that Defendant "kind of became the focal point." But whether concerns about the Defendant's behavior and identity "became the focal point" or not, the question remains whether the officers conduct remained consistent with the mission of the traffic stop. The answer to that question is yes. As noted above, the mission of the traffic stop reasonably included at least basic inquiries as to the identity of the individuals on

the scene.  And the officers did nothing more than engage in those inquiries during the exceedingly short time of this traffic stop.  That Defendant's behavior brought those inquiries more to the forefront of the officers' attention does not equal a Fourth Amendment violation.

Defendant cites *Rodriguez* for the proposition that the officers were only allowed to conduct investigatory inquiries as to the *driver's* identity, not Mr. Waller's. Specifically, in listing examples of the sort of ordinary tasks inherent in the mission of any traffic stop, the Court stated: "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615.

To be sure, *Rodriguez* in describing this example referred only to an identity check of a driver, not all passengers.  The Court, however, was not purporting to provide an exclusive list of ordinary tasks in which an officer may engage.[3]  And the Court was not purporting to overrule rulings by the Eleventh Circuit and other courts referring to the ability of the police to make routine inquires of all "a vehicle's occupants." *Purcell*, 236 F.3d at 1278 (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  While only a driver can usually be suspected of a moving

---

[3] Indeed, the legality of the identity check of the passenger in that case appears to have been moot, because only the conviction of the driver (Mr. Rodriguez) was before the Supreme Court.

violation, officer safety concerns permit the police to inquire as to who else they are encountering, especially in a high crime neighborhood such as the one at issue here.  *See Rice*, 483 F.3d at1084 (because "passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well.")

For all of these reasons, this straightforward, exceedingly brief, and minimally-intrusive traffic stop raises no Fourth Amendment concerns.

## CONCLUSION

It is **RECOMMENDED** that Defendant's Motions To Suppress [9][10] be **DENIED**.

This matter is **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 14th day of December, 2015.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE